No. 17-15579

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**Patricia Fox, O.D.,**
*Plaintiff and Appellee,*

vs.

**Vision Service Plan,**
*Defendant and Appellant.*

---

On Appeal from a Preliminary Injunction
United States District Court for the Eastern District of California
E.D. Cal. No. 2:16-cv-2456-JAM-DB
The Honorable John A. Mendez

---

## APPELLANT'S OPENING BRIEF

---

**MANATT, PHELPS & PHILLIPS, LLP**
Andrew H. Struve
Benjamin G. Shatz
Adrianne E. Marshack
695 Town Center Drive, 14th Floor
Costa Mesa, CA 92626
(714) 371-2500 • Fax (714) 371-2550

*Attorneys for Appellant*
Vision Service Plan

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,

Defendant and Appellant Vision Service Plan states that it does not

have a parent corporation and that no publicly held corporation owns

10% or more of its stock.

Dated: April 21, 2017       Respectfully submitted,

By: _s/Andrew H. Struve_

*Attorneys for Appellant*
Vision Service Plan

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    JURISDICTIONAL STATEMENT ........................................... 3

III.   ISSUES AND STANDARDS OF REVIEW ............................ 4

IV.   STATEMENT OF FACTS ..................................................... 5

     A.    Fox contracts with VSP, agreeing to VSP's Fair
          Hearing Procedure ............................................................. 5

     B.    VSP conducts a fraud audit, finds that Fox
          fraudulently billed VSP, and terminates Fox as a
          Network Doctor .................................................................. 8

     C.    Fox invokes her right to a fair hearing under the
          FHP, but then also files a lawsuit against VSP .............. 8

     D.    The district court grants Fox's motion for
          preliminary injunction; VSP appeals ............................. 9

V.    ARGUMENT ..................................................................... 11

     A.    As a matter of law, Fox has no likelihood of
          success on the merits ....................................................... 11

          1.    The district court lacked jurisdiction to
               entertain Fox's claims because she failed to
               exhaust her administrative remedies ................. 12

          2.    The California regulation Fox cites does not
               apply to the FHP, nor does the FHP violate
               it ........................................................................ 14

               a.    Section 1300.71.38 Does Not Apply
                    to VSP's FHP ........................................... 14

               b.    VSP's FHP does not violate
                    Section 1300.71.38 .................................. 17

          3.    The Federal Arbitration Act preempts
               Section 1300.71.38, and there is no reverse-
               preemption exception ......................................... 20

               a.    The "Business of Insurance" under
                    the McCarran-Ferguson Act focuses
                   primarily on the relationship between
                   the insurer and the insured ...................... 22

**TABLE OF CONTENTS**
(continued)

Page

b.    Section 1300.71.38 does not regulate the "Business of Insurance" because it does not protect or regulate the relationship between the insurer and the insured ................................................ 23

c.    Stretching Section 1300.71.38 to encompass indirect effects on the relationship between the insurer and insured is unprecedented and contrary to other similar decisions.......................... 31

4.    Fox will not likely succeed in showing that the FHP is unconscionable ................................ 34

a.    The FHP Is Not Procedurally Unconscionable ........................................ 35

b.    The FHP is not substantively unconscionable ......................................... 40

c.    Any unconscionable provision of the FHP should be severed ............................ 46

B.    Fox Would Not Suffer Irreparable Harm Without An Injunction ................................................. 47

C.    The Balance of Hardships Actually Tips in VSP's Favor ........................................................... 50

D.    Public Interest Is Not A Neutral Factor, And Weighs Against Injunctive Relief................................ 52

VI.    CONCLUSION .................................................... 53

# TABLE OF AUTHORITIES

## CASES

*Baltazar v. Forever 21, Inc.*,
   62 Cal. 4th 1237 (2016).................................................. 38

*Bleeck v. State Bd. of Optometry*,
   18 Cal. App. 3d 415 (1971)............................................ 13

*Camping Constr. Co. v. District Council of Iron Workers*,
   915 F.2d 1333 (9th Cir. 1990)................................. passim

*Charles J. Rounds Co. v. Joint Council of Teamsters No. 42*,
   4 Cal. 3d 888 (1971)...................................................... 12

*Cheng-Canindin v. Renaissance Hotel Assocs.*,
   50 Cal. App. 4th 676 (1996).......................................... 19

*Coachella Valley Mosquito & Vector Control Dist. v.
   California Pub. Emp't Relations Bd.*,
   35 Cal. 4th 1072 (2005)................................................. 13

*Collins v. Diamond Pet Food Processors of Cal.*,
   2013 U.S. Dist. LEXIS 60173 (E.D. Cal. Apr. 25, 2013)............. 38

*Crippen v. Central Valley RV Outlet, Inc.*,
   124 Cal. App. 4th 1159 (2004)....................................... 36

*Dotson v. Amgen, Inc.*,
   181 Cal. App. 4th 975 (2010)......................................... 46

*F.T.C. v. Standard Oil Co.*,
   449 U.S. 232 (1980) ...................................................... 47

*Fredericksburg Care Co., L.P. v. Perez*,
   461 S.W.3d 513 (Tex. 2015) .......................................... 32

*Graphic Commc'ns Union, Chicago Paper Handlers' &
   Electrotypers' Local No 2 v. Chicago Tribune Co.*,
   779 F.2d 13 (7th Cir. 1985)........................................... 51

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979) .............................................. passim

*Harper v. Ultimo*,
   113 Cal. App. 4th 1402 (2003)................................. 37, 38

*Harris v. Board of Supervisors, L.A. County*,
   366 F.3d 754 (9th Cir. 2004).......................................... 4

**TABLE OF AUTHORITIES**
**(continued)**

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..................................................... 48

*Ingalls v. Spotify USA, Inc.*,
    2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) ............................. 41

*International Ins. Co. v. Duryee*,
    96 F.3d 837 (6th Cir. 1996) ......................................................... 33

*Johnson v. City of Loma Linda*,
    24 Cal. 4th 61 (2000) ................................................................... 13

*LAWI/CSA Consolidators, Inc. v. Wholesale & Retail*
    *Food Distrib., Teamsters Local 63*,
    849 F.2d 1236 (9th Cir. 1988) ..................................................... 49

*Markow v. Rosner*,
    3 Cal. App. 5th 1027 (2016) ......................................................... 43

*Miguel v. JPMorgan Chase Bank, N.A.*,
    2013 U.S. Dist. LEXIS 16865 (C.D. Cal. Feb. 5, 2013) .............. 38

*Morgan Stanley & Co., LLC v. Couch*,
    134 F. Supp. 3d 1215 (E.D. Cal. 2015) .................................. 48, 49

*Newton v. Am. Debt Servs., Inc.*,
    549 F. App'x 692 (9th Cir. 2013) ................................................. 37

*Nyulassy v. Lockheed Martin Corp.*,
    120 Cal. App. 4th 1267 (2004) ..................................................... 40

*Pearson Dental Supplies, Inc. v. Superior Court*,
    48 Cal. 4th 665 (2010) ................................................................. 35

*Peng v. First Republic Bank*,
    219 Cal. App. 4th 1462 (2013) ................................................ 28, 38

*People v. Beaumont Inv., Ltd.*,
    111 Cal. App. 4th 102 (2003) ....................................................... 13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ....................................................... 4

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
    55 Cal. 4th 223 (2012) ............................................................ 35, 39

# TABLE OF AUTHORITIES
## (continued)

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010)..................................................passim

*Poublon v. C.H. Robinson Co.*,
  846 F.3d 1251 (9th Cir. 2017)................................................passim

*Renegotiation Bd. v. Bannercroft Clothing Co.*,
  415 U.S. 1 (1974) ..........................................................47

*Sanchez v. Carmax Auto Superstores Cal., LLC*,
  224 Cal. App. 4th 398 (2014)..........................................42, 43

*Sanchez v. Valencia Holding Co., LLC*,
  61 Cal. 4th 899 (2015).........................................35, 39, 40, 45

*SEC v. National Securities, Inc.*,
  393 U.S. 453 (1969) ......................................................22

*Serafin v. Balco Props. Ltd., LLC*,
  235 Cal. App. 4th 165 (2015)...........................................34, 37

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013).............................................11

*Smith v. PacifiCare Behavioral Health of Cal., Inc.*,
  93 Cal. App. 4th 139 (2001).........................................21, 22, 23

*Sonic-Calabasas A, Inc. v. Moreno*,
  57 Cal. 4th 1109 (2013)...................................................21

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009).............................................52

*Sullivan v. Lumber Liquidators, Inc.*,
  2010 U.S. Dist. LEXIS 53989 (N.D. Cal. June 2, 2010) ..............38

*Swarbrick v. Umpqua Bank*,
  2008 U.S. Dist. LEXIS 73678 (E.D. Cal. Aug. 5, 2008) ..............38

*Textile Unlimited, Inc. v. A..BMH & Co., Inc.*,
  240 F.3d 781 (9th Cir. 2001)..........................................49, 50

*Ting v. AT&T*,
  319 F.3d 1126 (9th Cir. 2003)..........................................41, 42

*Tompkins v. 23andMe, Inc.*,
  840 F.3d 1016 (9th Cir. 2016)..........................................44, 45

# TABLE OF AUTHORITIES
### (continued)

*U.S. Dept. of Treasury v. Fabe*,
   508 U.S. 491 (1993) ............................................................. passim

*Union Labor Life Ins. Co. v. Pireno*,
   458 U.S. 119 (1982) ............................................................. passim

*Westlake Cmty. Hosp. v. Super. Ct.*,
   17 Cal. 3d 465 (1976) .................................................................. 13

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................... 11

*Wolsey, Ltd. v. Foodmaker, Inc.*,
   144 F.3d 1205 (9th Cir 1998) .......................................... 18, 19, 20

*World Group Securities v. Tiu*,
   2003 WL 26119461 (C.D. Cal. Jul. 22, 2003) ................. 48, 49, 50

## STATUTES, RULES & REGULATIONS

9 U.S.C. § 2 ....................................................................................... 21

15 U.S.C. § 1012(b) ................................................................... 21, 24

28 U.S.C. § 41 ..................................................................................... 3

28 U.S.C. § 1291 ................................................................................. 3

28 U.S.C. § 1294(1) ............................................................................ 3

28 U.S.C. § 1332(a) ............................................................................ 3

Cal. Civ. Code § 1463 ....................................................................... 35

Cal. Civ. Code § 1530 ....................................................................... 43

Cal. Civ. Code § 1670.5 .................................................................... 46

Cal. Civ. Code § 3541 ....................................................................... 35

Cal. Code Civ. Proc. § 998 ............................................................... 43

Cal. Health & Safety Code § 1348 ..................................................... 6

Fed. R. Civ. Proc. 68 ........................................................................ 43

28 C.C.R. § 1300.71.38 ............................................................... passim

28 C.C.R. § 1300.71.38(a)(1) ...................................................... 15, 17

28 C.C.R. § 1300.71.38(a)(2) ...................................................... 15, 17

## I.    INTRODUCTION

Vision Service Plan ("VSP"), a not-for-profit healthcare service plan providing eye-care benefits to its enrollees, contracted with Dr. Patricia Fox for her to serve VSP members as one of its Network Doctors. A routine audit revealed that Fox had fraudulently billed VSP, receiving over $400,000 for services she claimed *she* had rendered to VSP members, when in fact the services had been provided not by Fox, but by a non-licensed individual to whom she had directed her patients. VSP terminated Fox from its network and sought to recover the payments she fraudulently obtained.

The parties' Network Doctor Agreement ("NDA") expressly allowed VSP to audit Fox's claims and, if appropriate, impose discipline on Fox. The NDA also expressly included a dispute resolution procedure—the Fair Hearing Procedure ("FHP")—to resolve disputes about VSP's imposition of discipline on Network Doctors like Fox. The FHP is a two-step process that includes an initial hearing before an independent panel of decision makers, and a subsequent binding arbitration if either party elects to have the decision of the fair hearing panel reviewed.

After VSP disciplined Fox for her fraudulent claims, Fox invoked the FHP, requesting a hearing. Before the hearing occurred, however, Fox sued VSP seeking a declaration that the FHP is not enforceable, either because it is illegal, unconscionable, or violates a

1

specific California regulation (28 C.C.R. § 1300.71.38) prohibiting arbitration of certain statutorily defined "claim disputes."

Fox sought and obtained a preliminary injunction preventing the FHP from proceeding during the pendency of her lawsuit.

The order enjoining the FHP rests on legal error and should be reversed. First, the district court erred in holding that Fox was likely to prevail on the merits of her claims. In fact, Fox has no likelihood of success on the merits. The court lacks jurisdiction to entertain Fox's claims in the first instance because Fox failed to exhaust her administrative remedies. Moreover, the district court erred in concluding that Fox is likely to succeed in proving that the FHP is both procedurally and substantively unconscionable and violates Section 1300.71.38. As a matter of law, the Federal Arbitration Act preempts Section 1300.71.38.

Second, the district court ignored binding precedent when it found that Fox would suffer irreparable injury without an injunction because she would be forced to participate in an arbitration that might ultimately prove illegal or unnecessary. This Court has made clear that undergoing a potentially unnecessarily arbitration is not irreparable injury. *See Camping Constr. Co. v. District Council of Iron Workers,* 915 F.2d 1333, 1349 (9th Cir. 1990).

Third, the district court also erred in determining that the balance of hardships favored Fox. The reason given by the court—that

2

Fox would have to expend considerable time and resources to engage in the FHP—is a neutral hardship shared by both parties. The balance of hardships actually tips against an injunction. Significantly, an injunction is likely to be used by other doctors to interfere with VSP's FHP—as Fox attempted to do in this case by pointing to other similar, unresolved lawsuits filed against VSP by her same lawyer.

Finally, the district court also erred in concluding that the public interest factor was neutral because an injunction would not likely affect non-parties. To the contrary, issuance of an injunction *is* likely to affect the public—VSP policyholders—by increasing their costs, because VSP will have to pass on its increased litigation costs as other doctors similarly try to postpone the FHP by challenging its validity in court, citing to the injunction in this case. Thus, this factor, like the other three factors, weighs *against* the issuance of an injunction. This Court should reverse the preliminary injunction.

## II.   JURISDICTIONAL STATEMENT

Fox sued VSP in California state court for declaratory relief under California law. (2-ER-34-41.) VSP removed the action to federal court based on diversity jurisdiction (28 U.S.C. § 1332(a)). (2-ER-27-30.) The district court granted Fox a preliminary injunction. (1-ER-1-26.) VSP timely appealed (3-ER-381), invoking this Court's appellate jurisdiction. (28 U.S.C. §§ 41, 1291, 1294(1).)

### III. ISSUES AND STANDARDS OF REVIEW

● Whether the district court erroneously concluded that Fox had a likelihood of success on the merits where: (1) the court lacked jurisdiction to adjudicate Fox's claims given her failure to exhaust her administrative remedies; (2) the state regulation (28 C.C.R. § 1300.71.38) that Fox claims bars arbitration does not apply to the FHP, nor does the FHP violate that regulation; (3) the Federal Arbitration Act preempts the state regulation that Fox claims invalidates VSP's FHP; and (4) the FHP is not unconscionable.

● Whether the district court erred in ruling that Fox had demonstrated that she would suffer irreparable harm without an injunction, that the balance of hardships favored a preliminary injunction, and that the public interest was a neutral factor, rather than weighing *against* injunctive relief.

Preliminary injunctions should be reversed if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of facts. *Harris v. Board of Supervisors, L.A. Count*y, 366 F.3d 754, 760 (9th Cir. 2004). Review is *de novo* when the district court's ruling rests solely upon a premise of law and the facts are either established or undisputed. *Id.* The district court's conclusions of law are reviewed *de novo*. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).

## IV.   STATEMENT OF FACTS

### A.   Fox contracts with VSP, agreeing to VSP's Fair Hearing Procedure.

Appellant Vision Service Plan is a not-for-profit healthcare service plan that contracts with optometrists to provide eye-care benefits to over 80 million VSP members. (2-ER-44.)

Appellee Patricia Fox is an optometrist in Boston, Massachusetts, who repeatedly contracted with VSP to be a VSP "Network Doctor." (2-ER-34, 86, 226, 233-61.) VSP's doctors sign a Network Doctor Agreement which delineates the scope of the parties' respective rights and duties. Fox executed a new NDA with VSP approximately every three years. (2-ER-226.) The NDA contains a provision allowing VSP to audit the doctor's services:

> **4. Services Subject to Review.** All of Network Doctor's services and materials provided to VSP Patients, and claims submitted to VSP, are subject to review and audit. Network Doctor shall fully cooperate with any VSP review or audit activity, including, without limitation, in-office audits and inspections, business audits, special investigation audits, medical record reviews and all similar VSP investigative or quality assurance efforts. … Network Doctor shall reimburse VSP in a timely manner for its reasonable out-of-pocket expenses and costs incurred in audit(s)/inspection(s) resulting in restitution due to improper billing. (2-ER-102-03.)

The NDA also provides that a doctor's "provision of any misleading or false information to VSP," including information

5

regarding services provided and/or regarding the treating doctor, are grounds for immediate termination of the NDA. (2-ER-103.)

The NDA differentiates between disputes between VSP and Network Doctors regarding claims, versus disputes relating to the result of an audit conducted under VSP's legally mandated Anti-Fraud and Abuse Policy. *See* Cal. Health & Safety Code § 1348. VSP provides different dispute resolution mechanisms for these disputes:

> Charge-Back Right. If Network Doctor (1) has been determined by VSP to have incorrectly or improperly billed VSP or a VSP Patient for Vision Care Services provided to a VSP Patient, (2) has billed for Vision Care Services that are excluded from coverage, or (3) has billed for Vision Care Services which are more expensive than those allowed thereunder, VSP will follow state specific law regarding the resolution of billing and claim disputes. ***If however a Network Doctor has been found to owe money to VSP pursuant to an audit conducted under VSP's Anti-Fraud and Abuse Policy**** … VSP is authorized to charge the account of Network Doctor for all monies found owing by Network Doctor to VSP ….
> (2-ER-103 [emphasis added].)

> Dispute of Services/Materials/Payment. In the event of any dispute(s) as to services, materials, and/or payment for same, concerning an Enrollee and/or VSP, VSP is authorized to withhold and set-aside in a suspense account or in trust, any funds owed to Network Doctor, pending the resolution of any dispute. … The facts of such dispute shall be submitted to the VSP Board of Directors, or any Committee duly appointed thereby, pursuant to the Fair Hearing Process.
> (2-ER-104.)

6

The NDA summarizes the two-step Fair Hearing Procedure ("FHP") that applies to disputes between VSP and a Network Doctor arising out of VSP's imposition of discipline under its required anti-fraud plan:

**Fair Hearing Procedure/Binding Arbitration**

a. <u>Fair Hearing</u>. In the event of a ***dispute as to VSP's imposition of any applicable disciplinary action against Network Doctor,*** Network Doctor, for himself/herself and on behalf of any derivative associate doctor(s), may appeal such action in accordance with the provisions and requirements, including the payment of fees and costs, set forth in the VSP Peer Review Plan and Fair Hearing Policy, as may be amended or replaced from time to time, and incorporated herein by reference (the "Fair Hearing Procedure").

b. <u>Binding Arbitration</u>. If the above process does not resolve the dispute, then, unless expressly disallowed by state law, any party may request final determination and resolution of the matter by mandatory binding arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. Chp. 1-3, in accordance with the Fair Hearing Procedure presently in effect. This mechanism, the initial costs of which shall be shared equally by the parties, shall be the sole method, in lieu of a jury or court trial, of resolving any dispute that may arise between Network Doctor and VSP. By this agreement and agreeing to binding arbitration, Network Doctor hereby waives his/her right to a jury trial as to any dispute with VSP, including without limitation, disputes relating to the delivery of services and disputes relating to claims and billing under any VSP insurance plan.
(2-ER-110 [emphasis added].)

7

Each of Fox's three successive NDAs clearly explained, with a bold heading, the two-step FHP. (2-ER-226, 241-42, 257.)

### B. VSP conducts a fraud audit, finds that Fox fraudulently billed VSP, and terminates Fox as a Network Doctor.

In May 2016, VSP audited Fox and found that she had fraudulently billed VSP for services which impermissibly had been provided by a non-licensed, non-credentialed individual. (2-ER-230.) Because VSP had paid Fox for these fraudulently billed services, VSP demanded restitution of $444,147 through an "Audit Findings/Adverse Action Letter." (2-ER-230, 268-75.) VSP also terminated Fox's status as a Network Doctor, and refused to accept claims from Fox as an out-of-network provider. (2-ER-269.)

### C. Fox invokes her right to a fair hearing under the FHP, but then also files a lawsuit against VSP.

After receiving VSP's Audit Findings/Adverse Action Letter, Fox exercised her right to have VSP's adverse actions against her reviewed in accord with the FHP, and a fair hearing was scheduled at Fox's request. (2-ER-230.) But before the FHP hearing occurred, Fox preemptively sued VSP. (2-ER-34, 230.)

Fox's lawsuit asserts a single claim seeking a declaration that the FHP violates Title 28, California Code of Regulations, Section 1300.71.38, and is therefore unenforceable. (2-ER-40.)

### D. The district court grants Fox's motion for preliminary injunction; VSP appeals.

In December 2016, Fox sought a preliminary injunction to stop the entirety of VSP's FHP that Fox herself had initiated. (2-ER-52-54.) The parties agreed to continue the fair hearing requested by Fox so that the court could entertain Fox's preliminary injunction motion. (2-ER-88.)

Fox argued that an injunction should issue because the FHP violated 28 C.C.R. § 1300.71.38, a regulation that prohibits arbitration of certain claim disputes. (2-ER-70.) Fox also argued that Section 1300.71.38 was *not* preempted by the FAA because she contended it fit within an exemption to preemption under the McCarran-Ferguson Act. (2-ER-70-72.)

Fox alternatively claimed that the FHP was unenforceable because it was both procedurally and substantively unconscionable. (2-ER-76-81.) And Fox argued that she would suffer irreparable harm without an injunction, because she would be forced to shut down her practice to participate in the FHP, spending time and resources on a procedure she claimed was illegal. (2-ER-81-83.) She also speculated that without an injunction she might lose her medical license because VSP might report her to various licensing boards, as VSP is required by law to do in such instances. (2-ER-82.)

9

VSP maintained that the FAA preempted Section 1300.71.38. (2-ER-206-14.) Moreover, Section 1300.71.38 did not apply to the FHP in the first instance because the procedure does not apply to disputes about VSP's imposition of discipline on its contracted providers. (2-ER-206-14.) Even if it did apply, the FHP does not violate Section 1300.71.38 because the initial fair hearing procedure does not constitute a prohibited "arbitration." (2-ER-205.)

VSP also argued that Fox failed to establish irreparable harm because Ninth Circuit precedent holds that the harm she claimed did *not* to constitute "irreparable harm," and was also speculative, and could be remedied by monetary damages. (2-ER-221-22.) Finally, VSP argued that the balance of the hardships and public interest weighed *against* issuance of an injunction because the injunction was likely to interfere with VSP's ability to engage in the FHP with other doctor-litigants who, like Fox, are likely to tout an injunction in this case to other courts in an effort to halt procession of the FHP. (2-ER-223.)

The court heard argument on Fox's motion on February 7, 2017. (3-ER-323-48.) At the hearing, the court focused largely on the "irreparable harm" factor, and whether engaging in the FHP would put Fox in an untenable position of having to waive her Fifth Amendment privilege to defend herself against VSP's claims of wrongdoing—an issue that had never been raised by Fox. (3-ER-327,

10

329-33, 335.) The Court ordered simultaneous briefing on the

Fifth Amendment issue. (3-ER-383.)

After two rounds of supplemental briefing, the court issued its

order granting a preliminary injunction (1-ER-1-26) and VSP

appealed (3-ER-381). The order granting the preliminary injunction

was silent as to the Fifth Amendment issue.

## V.     ARGUMENT

Fox failed to meet her burden of clearly showing the elements

necessary for a preliminary injunction. The relevant factors Fox had

to address were (1) a likelihood of success on the merits;

(2) irreparable harm without preliminary relief; (3) the balance of

equities; and (4) the public interest. *Winter v. Natural Resources*

*Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Shell Offshore, Inc. v.*

*Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). Here, all of

these factors favor VSP.

### A.     As a matter of law, Fox has no likelihood of success on the merits.

For Fox to have successfully shown a likelihood of success on

the merits, she had to demonstrate a likelihood of overcoming *all* of

the following four obstacles: (1) her failure to exhaust administrative

remedies; (2) the inapplicability of 28 C.C.R. § 1300.71.38 to the

entire FHP; (3) FAA preemption—i.e., she had to show that

§ 1300.71.38 regulates the business of insurance within the meaning

of the McCarran-Ferguson Act, and therefore fits within the Act's exemption to preemption (i.e., reverse preemption); and (4) that the FHP is not both procedurally and substantively unconscionable. Conversely, to show that Fox has no likelihood of success, VSP need only establish one of these as a defense. VSP can establish all four.

### 1. The district court lacked jurisdiction to entertain Fox's claims because she failed to exhaust her administrative remedies.

The district court's conclusion that Fox is likely to succeed on the merits is wrong as a matter of law because, as a fundamental and threshold issue, the court lacked jurisdiction to entertain Fox's claims because Fox failed to exhaust her administrative remedies. Although this was VSP's very first point in opposing Fox's motion (2-ER-202-03), the district court never even addressed this issue.

When parties have a contract that "provides grievance and arbitration machinery for the settlement of disputes," the parties "must exhaust these internal remedies before resorting to the courts in the absence of facts which would excuse him from pursuing such remedies." *Charles J. Rounds Co. v. Joint Council of Teamsters No. 42*, 4 Cal. 3d 888, 894 (1971). This rule "is analogous to the rule requiring the exhaustion of administrative remedies as a condition precedent to resorting to the courts." *Id.*

The exhaustion requirement mandates exhaustion of ***all*** available administrative appellate remedies, not just some of them. *Coachella Valley Mosquito & Vector Control Dist. v. California Pub. Emp't Relations Bd.*, 35 Cal. 4th 1072, 1079 (2005) (an administrative remedy is exhausted only upon termination of all available, nonduplicative administrative review procedures); *see also, People v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 124 (2003); *Bleeck v. State Bd. of Optometry*, 18 Cal. App. 3d 415, 432 (1971).

The exhaustion requirement is jurisdictional. *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 70 (2000) (exhaustion is a jurisdictional prerequisite to resort to the court); *Westlake Cmty. Hosp. v. Super. Ct.*, 17 Cal. 3d 465, 474-75 (1976) ("It is the general and well established jurisdictional rule that a plaintiff who seeks judicial relief against an organization of which he is a member must first invoke and exhaust the remedies provided by that organization applicable to his grievance.").

There is no dispute that Fox did not exhaust the contractual remedy provided by VSP. She scheduled a hearing under the FHP, but then went to court before that hearing took place. Hence, the district court lacked jurisdiction to proceed. The district court therefore erred in finding that Fox demonstrated a likelihood of success on the merits of claims that the court lacked jurisdiction to decide.

**2.    The California regulation Fox cites does not apply to the FHP, nor does the FHP violate it.**

The core of Fox's case is that a California regulation (28 C.C.R. § 1300.71.38) applies to the FHP and that the FHP violates the regulation. But neither of these is correct, as a matter of law.

**a.    Section 1300.71.38 Does Not Apply to VSP's FHP.**

Fox's attack on VSP's FHP relies on her citation to 28 C.C.R. § 1300.71.38, which provides (emphasis added):

> All health care service plans and their capitated providers that pay claims (plan's capitated provider) shall establish a fast, fair, and cost-effective dispute resolution mechanism to process and resolve contracted and non-contracted provider disputes. ***The plan and the plan's capitated provider may maintain*** separate dispute resolution mechanisms for contracted and non-contracted provider disputes and ***separate dispute resolution mechanisms for claims and other types of billing and contract disputes***, provided that each mechanism complies with [various sections of the Health and Safety Code and California Code of Regulations]. ***Arbitration shall not be deemed a provider dispute or a provider dispute resolution mechanism for the purposes of this section.***

VSP recognizes that it is considered a health care service plan subject to this regulation. But by its own terms, this regulation applies only to contracted or non-contracted "provider disputes," which the regulation defines as a provider's:

> written notice to the plan or the plan's capitated
> provider challenging, appealing, or requesting
> reconsideration of a claim (or a bundled group
> of substantially similar multiple claims that are
> individually numbered) that has been denied,
> adjusted or contested or seeking resolution of a
> billing determination or other contact dispute …
> or disputing a request for reimbursement of an
> overpayment of a claim. (28 C.C.R.
> §§ 1300.71.38(a)(1)&(a)(2).)

The district court believed that Fox would likely be able to demonstrate that her appeal of VSP's fraud audit findings and demand for restitution fits within the definition of a "provider dispute" and is therefore subject to the regulation. (1-ER-6.) This statutory interpretation is incorrect.

Section 1300.71.38 expressly provides that health plans may maintain different and separate dispute resolution mechanisms for other types of disputes, including "billing and contract disputes." 28 C.C.R. § 1300.71.38. The specific basis of VSP's imposition of discipline against Fox—including its claim for restitution and her expulsion as a Network Doctor—is that she committed fraud by billing for services that she herself did not provide and that were provided by non-licensed, non-VSP-credentialed persons. (2-ER-230, 268-275.) The NDA expressly prohibits this conduct:

> Any doctor … is prohibited from providing eye
> care services as a Network Doctor or otherwise to
> any VSP patient unless he/she is credentialed by
> the VSP or is granted VSP Doctor Network
> Participation, respectively. ***An Owner/Doctor***

15

> *must ensure that all doctors employed or engaged*
> *to provide eye care services to any VSP patient*
> *are and remain credentialed by VSP.*
> (2-ER-100-01, emphasis added.)

Contrary to the district court's view, the dispute at issue is more than just a dispute "seeking resolution of VSP's demand to pay VSP over $400,000 in restitution." (1-ER-6.) The dispute appeals VSP's findings that Fox committed fraud, and the discipline VSP imposed on Fox, including VSP's decision to expel Fox as a Network Doctor and its decision not to accept claims from Fox on an out-of-network basis. (2-ER-270.)

Indeed, in Fox's "Request for Hearing," Fox identified some of following issues she was disputing as "issues to be determined at the hearing":

- "Network doctor [Fox] disputes the findings and conclusions of the auditor as stated in the Notice of Adverse Action."

- "Network doctor disputes the decision either terminating his [sic] network provider agreement or that there is a rational basis for doing so."

- "Network doctor disputes the statistical validity of the sampling and extrapolation and disputes that the sample is random and disputes that it fairly represents the universe of claims."

- "Network doctor disputes the audit fees charged."

- "Network doctor disputes that the claims submitted were false or misleading, or improper, and disputes that VSP can apply a 3-year statute of limitations, or go back 3 years, in the audit."

(3-ER-371.)

16

None of these disputes—which Fox herself identified—are challenges to a claim "that has been denied, adjusted or contested" within Section 1300.71.38's definition of a "provider dispute." Nor are these disputes "seeking resolution of a billing determination or other contract dispute" or "disputing a request for reimbursement of an overpayment of a claim" within the "provider dispute" definition. *See* 28 C.C.R. §§ 1300.71.38(a)(1)&(2). Rather, the disputes involve VSP's audit findings, VSP's decision to terminate Fox from the network, and the reasonableness of the amount of money sought by VSP (which is not calculated solely on "overpayment of a claim"). Because the disputes at issue do not fit within the definition of "provider disputes" under Section 1300.71.38, the district court was wrong to conclude that Fox was likely to succeed in demonstrating that the regulation applies.[1]

### b. VSP's FHP does not violate Section 1300.71.38.

The district court also incorrectly concluded that Fox could likely establish that the FHP violates Section 1300.71.38's prohibition on arbitration as a "dispute resolution mechanism." (1-ER-7.) In so

---

[1] Fox's NDA and the FHP both clarify that the FHP only applies to "VSP's imposition of any applicable disciplinary action against Network Doctor." (2-ER-110.) As the district court acknowledged, VSP has a separate and different dispute resolution mechanism for the type of "provider disputes" contemplated by Section 1300.71.38. (1-ER-6; 2-ER-226-27, 229-30.)

holding, the district court determined that the FHP's first step—a hearing before a Fair Hearing Panel—constituted "arbitration" under *Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d 1205 (9th Cir 1998). (1-ER-7.) But that decision and its reliance on *Wolsey* are legally flawed.

*Wolsey* addressed whether a procedure clearly designated as "non-binding arbitration … in accordance with the then-current rules of the American Arbitration Association" fit within the Federal Arbitration Act's definition of "arbitration" such that it could be compelled under the FAA. *Wolsey,* 144 F.3d at 1207, 1209. In opposing the defendant's motion to compel arbitration, the plaintiff argued that the FAA did not apply to *non-binding* arbitration, and therefore could not be compelled under the statute. *Id.* This Court rejected the argument that the FAA differentiated between non-binding and binding arbitration, stating that parties agree to submit to arbitration under the FAA when they: (1) "agree to submit a dispute for decision by a third party," and (2) "agree not to pursue litigation until the process is completed." *Id.* at 1208.

To begin, it is not clear that the criteria for determining whether a dispute resolution mechanism constitutes "arbitration" under Section 1300.71.38 is the same criteria this Court articulated for determining whether a procedure constitutes an agreement to arbitrate under the FAA. Neither the district court nor Fox provided any authority suggesting, much less holding, that the criteria are the same.

18

This is a critical omission. If the definition of "arbitration," as prohibited by Section 1300.71.38, was determined by the *Wolsey* standard, any dispute resolution procedure that included submission of an issue to a neutral third party for decision would be prohibited by the regulation. Conversely, the statute nonetheless would allow for a dispute resolution procedure in which a health care service plan could designate its own employees as the arbiters of disputes. This would be an absurd result, and certainly not the "fair" dispute resolution mechanism contemplated by the regulation. For this reason, the definition of "arbitration" set forth in *Cheng-Canindin v. Renaissance Hotel Associates,* 50 Cal. App. 4th 676, 683 (1996), and which the district court rejected, makes much more sense. The *Cheng* court held that "a dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision." *Id.* at 687-88.

Under *Cheng,* the first step of the FHP—a hearing before the Fair Hearing Panel—does not fit within the definition of "arbitration" because the panel's decision is non-binding if either party seeks its review. Thus, because it does not qualify as "arbitration," it does not violate Section 1300.71.38.

Even if the criteria set forth in *Wolsey* did apply, however, the hearing before the Fair Hearing Panel does not satisfy the criteria to

19

be considered "arbitration." Although the Fair Hearing Panel is a third party that will issue a decision, that hearing procedure is not the final step that must be completed before litigation can be pursued, in the event that either party disagrees with the Fair Hearing Panel's decision. In such instances, there is the second step in the FHP—binding arbitration. Because the FHP process is not "completed" until the second step is completed, the first step—the hearing before the Fair Hearing Panel—is distinguishable from the "non-binding arbitration" agreement in *Wolsey* and does not meet the criteria for qualifying as "arbitration" under the FAA.

Thus, the district court erred in finding that Fox will likely be able to demonstrate that the first step in the FHP—the hearing before the Fair Hearing Panel—violates Section 1300.71.38.

### 3. The Federal Arbitration Act preempts Section 1300.71.38, and there is no reverse-preemption exception.

The district court erred in concluding that Fox could likely succeed in establishing that the FHP violates Section 1300.71.38 for yet another reason—namely, the regulation is preempted by the FAA. The district court's reasoning that Fox is likely to avoid preemption is wrong.

The FAA provides that arbitration provisions shall be enforced, "save upon grounds as exist at law or in equity for the revocation of

20

any contract." 9 U.S.C. § 2. Although a state court can refuse to enforce an arbitration clause on the basis of generally applicable contract defenses, a state court may not refuse to enforce an arbitration clause by applying state laws applicable only to arbitration provisions. *See Sonic-Calabasas A, Inc. v. Moreno,* 57 Cal. 4th 1109, 1139-44 (2013).[2] Thus, the FAA preempts California's regulation, absent an exception.

The McCarran-Ferguson Act provides an exception to the FAA's (and other federal laws') preemption of state laws in certain circumstances. Specifically, the McCarran-Ferguson Act states that no federal law (including the FAA) will pre-empt "any law enacted by any State *for the purpose of regulating the business of insurance*." 15 U.S.C. § 1012(b) (emphasis added). In other words, if a state law regulates the business of insurance, it will reverse-preempt federal law under the McCarran-Ferguson Act. If the state law does not regulate the business of insurance, then federal preemption of conflicting state laws applies. *See Smith v. PacifiCare Behavioral Health of Cal., Inc.,* 93 Cal. App. 4th 139, 149 (2001). The key legal question here is

---

[2] "*Concepcion* … address[ed] unconscionability, and the high court made clear that courts cannot impose unconscionability rules that interfere with arbitral efficiency, including rules forbidding waiver of administrative procedures that delay arbitration." *Sonic-Calabasas*, 57 Cal. 4th at 1141.

whether Section 1300.71.38 regulates the business of insurance within the meaning of the McCarran-Ferguson Act.

Fox argued that Section 1300.71.38 qualifies as a law "enacted for the purpose of regulating the business of insurance," such that it fits within the McCarran-Ferguson Act's exception to federal preemption. (2-ER-67-68, 70-72.) The district court erred in finding Fox was likely to prevail on this argument.

### a. The "Business of Insurance" under the McCarran-Ferguson Act focuses primarily on the relationship between the insurer and the insured.

The focus of the McCarran-Ferguson Act, and its "business of insurance" reference, is the relationship between an insurer and its policyholders. *Smith*, 93 Cal. App. 4th at 155 ("whatever the exact scope of the statutory term ["business of insurance"], it is clear where the focus was—it was on the relationship between the insurance company and the policyholder"), citing *SEC v. National Securities, Inc.*, 393 U.S. 453, 459-60 (1969). Therefore, laws "aimed at protecting or regulating the relationship between insurer and insured, directly or indirectly, are laws regulating the 'business of insurance' within the meaning of that phrase as it is used in McCarran-Ferguson." *Smith*, 93 Cal. App. 4th at 154 (emphasis added).

To determine whether a regulation is aimed at the business of insurance, the question is whether the state law fits a common-sense

22

understanding of an insurance regulation. *Smith*, 93 Cal. App. 4th at 159. The Supreme Court has repeatedly identified three factors as relevant to what constitutes the "business of insurance": (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Id.* at 155; *see also*, *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 497-98 (1993); *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 127-29 (1982). Section 1300.71.38 does not meet any of this criteria.

> **b.** **Section 1300.71.38 does not regulate the "Business of Insurance" because it does not protect or regulate the relationship between the insurer and the insured.**

Section 1300.71.38 affects the relationship between the insurer and the medical provider, not the policyholder. The Supreme Court has repeatedly held that this relationship falls outside of the "business of insurance" within the meaning of the McCarran-Ferguson Act such that state laws regulating this relationship do not reverse-preempt federal law.

For example, in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205 (1979), a group of pharmacies brought an antitrust action against insurance companies, contending that the defendant insurance companies entered into "Pharmacy Agreements"

with pharmacies, which illegally fixed the retail prices of drugs.
The defendant insurance companies argued that federal antitrust law
did not apply because it was reverse-preempted by the McCarran-
Ferguson Act since the challenged practice constituted the "business
of insurance." *Id.* at 207-08. The Supreme Court rejected that
argument, holding that agreements between the insurance companies
and pharmacies did not constitute the "business of insurance" within
the meaning of Section 1012(b) of the McCarran-Ferguson Act. *Id.* at
217.

First, the Supreme Court reasoned, the agreements did not
involve underwriting of policies or spreading risk, but were "merely
arrangements for the purchase of goods and services" by the insurance
companies. *Id.* at 214. The Supreme Court noted that the benefit
provided to policyholders is that their premiums would cover the cost
of prescription drugs; "[s]o long as that promise is kept, policyholders
are basically unconcerned with arrangements made between [the
insurance company] and participating pharmacies." *Id.*

Second, the contract was not between the insurer and the
insured, but rather between a service provider—the pharmacy—and
the insurer. *Royal Drug*, 440 U.S. at 215-16.

Third, the agreement was not limited to entities in the insurance
industry. The Pharmacy Agreements were "separate contractual
arrangements between [the insurer] and pharmacies engaged in the

24

sale and distribution of goods and services other than insurance."
*Id.* at 216.

The Supreme Court rejected the pharmacies' argument that the Pharmacy Agreements related so closely to the "reliability, interpretation, and enforcement" of the insurance contract between insurance companies and policyholders to fall within the business of insurance, saying:

> [E]very business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer …. If terms such as "reliability" and "status as a reliable insurer" were to be interpreted in the broad sense urged by the [pharmacies], almost every business decision of an insurance company could be included in the "business of insurance." Such a result would be plainly contrary to the statutory language, which exempts the "business of insurance" and not the "business of insurance companies." (*Royal Drug*, 440 U.S. at 217.)

Similarly, in *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 126 (1982), plaintiff chiropractors sued the defendant insurance company, contending that the insurer's peer review practice for determining whether charges for certain chiropractic care were "reasonable" and whether such care and services were "necessary" and therefore covered by insurance policies violated federal antitrust laws. *Id.* at 122. The insurance company argued that its peer review practice constituted the "business of insurance" and was therefore

25

exempted by the McCarran-Ferguson Act from federal antitrust laws. *Id.* at 126. The Supreme Court disagreed. *Id.* at 134.

The Court reasoned that the peer review process did not involve the underwriting of policies or spreading the risk, saying that the peer review process "takes place only after the risk has been transferred by means of the policy," and is "logically and temporally unconnected to the transfer of risk accomplished by the defendant's insurance policies. *Id.* at 130.

The Supreme Court also determined that the peer review process was "not an integral part of the policy relationship between the insurer and insured," was "obviously distinct" from the defendant's contracts with its policyholders, and was a "separate arrangement between the insurer and third parties not engaged in the business of insurance." *Id.* at 131. Any decision of the peer review committee "is a matter of indifference to the policyholder, whose only concern is whether his claim is paid, not why it is paid." *Id.* at 132.

Finally, the Court found that the peer review practice was not limited to entities within the insurance industry, but rather involved third parties "wholly outside the insurance industry—namely, practicing chiropractors." *Pireno*, 458 U.S. at 132.

While *Royal Drug* and *Pireno* considered whether a particular practice constituted the "business of insurance" under Section 2(b) of the McCarran-Ferguson Act, a later case, *U.S. Department of*

26

*Treasury v. Fabe*, 508 U.S. 491 (1993), applied the same criteria when determining whether a state law constituted a law that "regulated" the business of insurance—the precise inquiry here. *Fabe* analyzed whether an Ohio bankruptcy priority statute escaped preemption by the federal bankruptcy priority statute under the McCarran-Ferguson preemption exemption. *Id.* at 493.

The Supreme Court held that part of the Ohio statute escaped preemption to the extent it prioritized the right of policyholders over other creditors because this purpose of this portion of the law was "to ensure that, if possible, policyholders ultimately will receive payment on their claims." *Id.* at 506. This was because, by creating priority in bankruptcy for claims by insureds against their bankrupt insurer, the insurer-insured relationship plainly was implicated. To the extent the remainder of the Ohio statute conflicted with the federal priority statute, however, the Supreme Court held that the law did not regulate the business of insurance and was therefore preempted. *Id.* at 493-94, 505-06.

Here, just as in *Royal Drug* and *Pireno*, the FHP at issue— which Fox argues violates Section 1300.71.38—is not applicable between the insurer and the insured, but rather between the insurer and medical providers (i.e., third parties who are not engaged in the business of insurance). The FHP does not spread risk or involve the underwriting of policies. Policyholders are "basically unconcerned"

27

with the manner in which a dispute is resolved between VSP and its providers, so long as the policyholder receives the vision services in accordance with his or her policy with VSP. Therefore, VSP's FHP does not constitute the "business of insurance," and Section 1300.71.38, which regulates certain dispute resolution procedures between health care service plans and providers, consequently does not regulate the business of insurance within the McCarran-Ferguson Act's preemption exemption.

In granting the preliminary injunction, the district court stated that reliance on *Royal Drug* and *Pireno* was "misplaced" given the following statement in *Fabe:*

> Both *Royal Drug* and *Pireno* ... involved the scope of the antitrust immunity located in the *second* clause of § 2(b). We deal here with the *first* clause, which is not so narrowly circumscribed. The language of § 2(b) is unambiguous: The first clause commits laws "enacted … for the purpose of regulating the business of insurance' to the States, while the second clause exempts only 'the business of insurance' itself from the antitrust laws. To equate laws 'enacted … for the purpose of regulating the business of insurance' with 'the business of insurance" itself … would be to read words out of the statute. This we refuse to do. (1-ER-9, citing *Fabe,* 508 U.S. at 504.)

This analysis is flawed and fails to follow clear guidance from the Supreme Court on this very distinction. While the Supreme Court in *Fabe* recognized, as VSP does, that the two clauses of the McCarran-Ferguson Act are slightly different—and what qualifies as a law enacted "for the purpose of regulating the business of

insurance" is broader than simply "the business of insurance"—the Court in *Fabe* applied the *Pireno* factors when determining that a *portion* of the law at issue regulated the business of insurance, as described above. The Supreme Court stated that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Fabe,* 508 U.S. at 505. The Court went on to say that "actual performance of an insurance contract is an essential part of the 'business of insurance.'" *Id.* Because a portion of the bankruptcy statute was aimed at protecting or regulating the performance of an insurance contract—making sure policyholders receive payment on their claims after an insurance company declares bankruptcy—that portion of the statute was "enacted for the purpose of regulating the business of insurance" within the meaning of the McCarran-Ferguson Act. *Id.* at 505-06.

By contrast, Section 1300.71.38 does not have an "end, intention, or aim" of adjusting, managing, or controlling the business of insurance because it does not adjust, manage, or control the relationship between the policyholder and the insurance company— the "business of insurance."

Nor does Section 1300.71.38 protect or regulate the performance of an insurance contract, which is necessarily between a

*policyholder* and an insurance company. As the Supreme Court recognized in both *Royal Drug* and *Pireno,* and reiterated in *Fabe,* when a policyholder goes to a doctor who is reported to be in-network for medical services that the insurance contract says are covered, then the policyholder's concern is whether or not she can receive those services at the expected cost to her. The policyholder is *not* concerned with whether or how much a *provider* is paid under the *provider's* contract with the insurer.[3] *Royal Drug*, 440 U.S. at 214 (the benefit provided to policyholders is that their premiums would cover the cost of prescription drugs; "[s]o long as that promise is kept, policyholders are basically unconcerned with arrangements made between [the insurance company] and participating pharmacies"); *Pireno*, 458 U.S. at 132 (a decision by a peer review committee in disputes between providers and insurance companies regarding whether or not claims for chiropractic services were reasonable and necessary was "a matter of indifference to the policyholder, whose only concern is whether his claim is paid, not why it is paid"); *Fabe,* 508 U.S. at 503.

There is no issue in this case about whether VSP's insureds received their full panoply of vision benefits from VSP, or whether the insureds are responsible for payments for which VSP determined

---

[3] Neither an insurance company nor a policyholder will, as part of their insurance contract, assume the risk that a third-party medical provider will fraudulently bill for her services. And with good reason.

Fox fraudulently billed. In fact, Section 1300.71.38 governs disputes between medical providers and health care plans that arise *after* a policyholder has already received the benefits provided under the insurance contract and the provider submits a claim to the health care plan. Thus, rather than protecting or regulating the performance of an insurance contract, Section 1300.71.38 regulates only the performance of a contract between a medical provider and a health care plan.

Because Section 1300.71.38 was not a regulation "enacted for the purpose of regulating the business of insurance" within the meaning of the McCarran-Ferguson Act, it does not fall within the Act's exemption to federal preemption. Thus, the FAA preempts Section 1300.71.38, making it legally impossible for Fox to establish that the FHP is illegal.

> **c.  Stretching Section 1300.71.38 to encompass indirect effects on the relationship between the insurer and insured is unprecedented and contrary to other similar decisions.**

As an alternative ground for its ruling, the district court said that even if Fox cannot demonstrate that Section 1300.71.38 directly regulates the relationship between the insurer and policyholders (i.e., "the business of insurance"), Fox likely can show that the regulation indirectly regulates that relationship "because the insurer's

31

relationship with the provider is integral to the insurer's relationship with its policyholders." (1-ER-9.) This position is wrong.

The district court cited no precedent for its conclusion, which stretches McCarran-Ferguson to exempt from preemption state laws that affect rights of persons or entities *other than* policyholders. Indeed, multiple courts have expressly *refused* to adopt such an analysis:

- In *Fredericksburg Care Company, L.P. v. Perez*, 461 S.W.3d 513 (Tex. 2015), the Texas Supreme Court held that a Texas law prohibiting arbitration in certain disputes between *medical providers* and their *patients* was not a law regulating the business of insurance under McCarran-Ferguson. *Id.* at 526-28. The Texas high court rejected the argument that the statute regulated the business of insurance because it "applies to the processing of disputed claims against policyholders," which the proponents argued had "a direct and substantial effect on the performance of an insurance company's defense and indemnity obligations under its insurance contract with policyholders." *Id.* at 527. The court said that the proponents of reverse-preemption had failed to show that the law at issue was "aimed at protecting or regulating the performance of a contract of insurance—either between the health care provider and its malpractice insurer, or the patient and its insurer—to satisfy all three *Pireno* factors." *Id.* at 528. That is precisely the situation here.

●    In *International Ins. Co. v. Duryee*, 96 F.3d 837 (6th Cir. 1996), the Sixth Circuit affirmed a decision holding that an Ohio state law preventing out-of-state insurance companies from removing cases to federal court was not a law "aimed at regulating the business of insurance" under the McCarran-Ferguson Act. *Id.* at 839-40. In so holding, the Sixth Circuit expressly rejected the contention that the statute "assisted Ohio policyholders in enforcing their insurance policies by assuring them a convenient state court forum in which to sue their insurance companies" and thus regulated the business of insurance. *Id.* at 840. The court distinguished the bankruptcy statute in *Fabe* and said the Ohio law neither regulated the policy relationship between the insured and the insurer nor affected an *insured's* right to obtain payment on a policy. *Ibid.* The Sixth Circuit noted that "[t]he McCarran-Ferguson Act was not meant to protect a statute so tangentially related to insurance from the general rule of federal law supremacy." *Id.*

The Supreme Court recognized in *Royal Drug*, and again reiterated in *Fabe*, that an argument could be made—as the district court essentially did here—that nearly every act of an insurance company ultimately has an effect on policyholders and on an insurance company's status as a reliable insurer. *Fabe*, 508 U.S. at 508-09. This argument, the Supreme Court said, "goes too far." *Id.* at 508. The Court "rejected the notion that such indirect effects are

sufficient for a state law to avoid pre-emption under the McCarran-Ferguson Act." *Id.* at 509 (following and citing *Royal Drug*). Courts have repeatedly and consistently rejected efforts to extend McCarran-Ferguson to relationships other than those between insurers and insureds, notwithstanding a theoretical downstream or "indirect" effect on policyholders. That is what the district court did, but the body of case law says that is just "too far" a stretch.

In sum, not only is the district court's determination that Section 1300.71.38 likely reverse-preempts the FAA unprecedented, it is contrary to applicable law, and inconsistent with decisions of other courts in similar contexts. This legal conclusion is dispositive of Fox's claims and the question of injunctive relief: Fox cannot succeed on the merits of her claim that the FHP violates Section 1300.71.38 when the FAA preempts that state regulation.

### 4. Fox will not likely succeed in showing that the FHP is unconscionable.

Fox also argues that the FHP is unconscionable. (2-ER-76-81.) The district court recognized that it was *Fox's* burden—as the party seeking to avoid arbitration—to establish that the FHP was both procedurally and substantively unconscionable. (1-ER-10, citing *Serafin v. Balco Props. Ltd., LLC,* 235 Cal. App. 4th 165, 172 (2015).) But the court erred in concluding that Fox was likely to succeed in showing that the FHP in its entirety is both procedurally

and substantively unconscionable. Any doubts about whether or not an arbitration agreement is enforceable should be resolved *in favor* of enforceability. *See Pearson Dental Supplies, Inc. v. Superior Court*, 48 Cal. 4th 665, 682 (2010); *see also*, Cal. Civ. Code § 3541 ("[a]n interpretation which gives effect [to an agreement] is preferred to one which makes void"); Cal. Civ. Code § 1463 (if possible without violating the parties' unambiguous intent, a contract is interpreted so as to make it "lawful, operative, definite, reasonable, and capable of being carried into effect").

### a.    The FHP Is Not Procedurally Unconscionable

Procedural unconscionability "addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246-47 (2012). "An evaluation of unconscionability is highly dependent on context." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015). "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." *Id.* at 912.

The district court accepted, contrary to the evidence, that the NDA and the FHP were non-negotiable adhesion contracts, such that Fox did not have a "fair opportunity" to review the FHP before

signing the NDA because VSP did not attach it to the NDA, or otherwise tell Fox how to obtain it before signing. (1-ER-13-14.) But the undisputed evidence that was before the court contradicts this notion. VSP's evidence was that other doctors seeking to be a part of VSP's provider network have proposed changes to the NDA, and that in some instances VSP has accepted proposed changes. (2-ER-227.) Fox, on the other hand, provided no evidence refuting that she could have, but did not, propose changes to the NDA. Instead, Fox admitted that she *did not even bother to read* the NDA before signing. (2-ER-87.) "There is no reason in this case to conclude that [Fox] lacked power to bargain" simply because she failed to try. *See Crippen v. Central Valley RV Outlet, Inc.,* 124 Cal. App. 4th 1159, 1166 (2004) (rejecting plaintiff's argument that an adhesion contract was procedurally unconscionable even though a form contract was used, because nothing prevented plaintiff from trying to negotiate, and "nothing in the record shows that plaintiff could not bargain in this case").

The district court also accepted Fox's assertion that VSP "dominates the vision market" and that Fox "didn't feel [she] had any choice but to sign the NDA," because revenue from VSP patients made up 40-50% of her total revenue. (2-ER-13, 91-92.) The district court's reliance on these assertions ignores key facts. Fox is a self-declared "provider for numerous" vision care and medical plans, and

36

could therefore supplement her practice by taking on more patients covered by those plans. (2-ER-87.) Further, despite being terminated from VSP's network for over six months when she signed her declaration, Fox made no representations that her practice actually had suffered as a result of her VSP termination. The absence of such information is significant, and undermines Fox's argument that the NDA was procedurally unconscionable.

The district court recognized that, even if the NDA was a "take it or leave it," non-negotiable contract, this would not make the NDA unenforceable. (1-ER-12; *Serafin,* 235 Cal. App. 4th at 179.) The court then stated that the NDA and FHP contained an additional oppressive or surprising element, i.e., that the FHP was not physically attached to the NDA, relying on *Newton v. Am. Debt Servs., Inc.,* 549 F. App'x 692, 694 (9th Cir. 2013), *Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 997 (9th Cir. 2010), and *Harper v. Ultimo,* 113 Cal. App. 4th 1402, 1406 (2003). (1-ER-13-14.)

But the district court ignored more recent federal and California state precedent holding that the fact that the rules governing the arbitration procedure are not attached to the agreement containing the arbitration provision does not render the agreement procedurally unconscionable. *See, e.g., Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1262 (9th Cir. 2017) (holding that incorporation of rules governing dispute resolution procedure by reference "does not support

37

[the] claim that the dispute resolution provision was oppressive");
*Baltazar v. Forever 21, Inc.,* 62 Cal. 4th 1237, 1245-46 (2016)
(rejecting argument that an arbitration agreement was procedurally
unconscionable because it did not attach a copy of the arbitration
rules); *Peng v. First Republic Bank,* 219 Cal. App. 4th 1462, 1472
(2013) ("failure to attach the AAA rules, standing alone, is
insufficient grounds to support a finding of procedural
unconscionability").[4]

Although the district court attempted to distinguish *Poublon* by
saying that, in that case, the contract indicated how to obtain a copy of
the arbitration procedure, this Court did not state this was a
requirement in order to avoid unconscionability. Nor was whether or
not a contract specifically advised where to find a copy of the rules a
dispositive factor in any of the other decisions cited above (and cited
below in footnote 4), which all held that incorporation of the rules

---

[4] S*ee also, Collins v. Diamond Pet Food Processors of Cal.,* 2013
U.S. Dist. LEXIS 60173, *12-13 (E.D. Cal. Apr. 25, 2013) (rejecting
argument that failure to attach incorporated rules rendered arbitration
agreement procedurally unconscionable); *Miguel v. JPMorgan Chase
Bank, N.A.,* 2013 U.S. Dist. LEXIS 16865 (C.D. Cal. Feb. 5, 2013)
(same)*; Sullivan v. Lumber Liquidators, Inc.,* 2010 U.S. Dist. LEXIS
53989 (N.D. Cal. June 2, 2010) (distinguishing *Harper* and holding
failure to attach incorporated rules did not render agreement
procedurally unconscionable); *Swarbrick v. Umpqua Bank*, 2008 U.S.
Dist. LEXIS 73678 (E.D. Cal. Aug. 5, 2008) ("Mere incorporation of
the AAA rules … does not constitute procedural unconscionability.").

governing a dispute resolution procedure by reference did not make the arbitration agreement procedurally unconscionable.

In any event, the letter accompanying the NDA provided Fox with a telephone number if she had "any questions or would like additional details." (2-ER-86, 113.) So she could have called to ask for a copy of the FHP, had she wanted to review it (assuming, of course, that she had bothered to read the proposed contract before signing it, which she has admitted she did not).

The district court also improperly disregarded that Fox had signed *several* NDA's with the similar bold heading "Fair Hearing Procedure/Binding Arbitration" on various previous occasions, before signing the NDA at issue. (2-ER-226-27, 241, 257.) The district court noted that VSP did not provide any authority "supporting its claim that a contract is not unconscionable if a party has previously seen or signed a similar contract." (1-ER-12.) But this comment misrepresents VSP's argument and fails to take into account the importance of "context" in the unconscionability analysis. *Sanchez*, 61 Cal. 4th at 911. VSP's point in raising how the NDA at issue was the *third* NDA Fox signed containing the "Fair Hearing Procedure/Binding Arbitration" section and referencing and incorporating by reference the "Fair Hearing Procedure" is that Fox cannot claim to have been "surprised" by the arbitration provision—an important factor in the

39

procedural unconscionability analysis. *Pinnacle*, 55 Cal. 4th at 246-47.

Fox cannot demonstrate that the NDA or FHP are procedurally unconscionable. The district court erred in concluding Fox would likely succeed in establishing unconscionability.

### b. The FHP is not substantively unconscionable.

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Sanchez*, 61 Cal. 4th at 910. The district court found several of the FHP's provisions rendered it substantively unconscionable. That position fails to withstand scrutiny.

**Pre-Appeal: Good Faith Effort to Resolve the Dispute.** After a Network Doctor receives a notice from VSP that adverse action has been or will be taken, the FHP allows for an informal meeting "to discuss the findings and allegations set forth in the Notice in a good faith effort to resolve the dispute without the need for a Hearing." (2-ER-122.) Fox argued that this procedure is a one-sided "free peek" for VSP into a doctor's arguments and defenses, citing *Nyulassy v. Lockheed Martin Corp.,* 120 Cal. App. 4th 1267 (2004). (2-ER-78.)

Although the court acknowledged that the provision in the FHP was distinguishable from the pre-appeal discussion requirement in *Nyulassy,* the court said that the FHP's provision was not mutual

because "nothing in the FHP requires VSP to provide any information to the [Network Doctor]." (1-ER-16.) This ignores, however, that nothing in the FHP requires a *Network Doctor* to provide any information to VSP during this informal meeting either. (2-ER-122.) And, in fact, by the time the meeting occurs, the Network Doctor will have already had her own, comprehensive "free peek" into VSP's contentions and arguments through the Adverse Action Letter, which outlines the results of the audit, including a spreadsheet of results, and details how the amount of restitution was arrived at.[5] (2-ER-230, 268-75.) Thus, the informal meeting is, *at worst* (for the doctor)*,* a mutual process.

**Confidentiality Provision.** The district court also erroneously determined that the FHP's confidentiality provision rendered the FHP substantively unconscionable, citing *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), *Ingalls v. Spotify USA, Inc.*, 2016 WL 6679561 (N.D. Cal. Nov. 14, 2016), and *Pokorny,* 601 F.3d at 1002, which found confidentiality provisions substantively unconscionable. (1-ER-16-19.) In each of those cases, the provisions were found unenforceable because, although mutual on their face, functionally they prevented a plaintiff from having access to information regarding similar cases, while the "repeat player" defendant *would* have access to such

---

[5] In this way, the meeting is unlike the meeting in *Pokorny* as well. 601 F.3d at 999.

information by virtue of its participation in similar suits. But this Court rejected that precise reasoning in *Poublon*, 846 F.3d at 1265-66.

In *Poublon,* this Court ruled that it was bound to follow a more recent California case than *Pokorny* on whether a confidentiality provision in an arbitration agreement was unconscionable[6]—*Sanchez v. Carmax Auto Superstores California, LLC,* 224 Cal. App. 4th 398, 408 (2014). *Carmax* held there was "nothing unreasonable or prejudicial" about a confidentiality provision with respect to the parties themselves, and such a provision was not substantively unconscionable. *Poublon,* 846 F.3d at 1266.

The district court attempted to distinguish *Poublon* and *Carmax* by stating that the confidentiality provisions in those cases included an exception to the confidentiality requirement *if the parties agreed* to waive the confidentiality requirement. (1-ER-18-19.) Therefore, the court reasoned, the confidentiality provision in the FHP "exceeds the scope" of the confidentiality provisions in *Poublon* and *Carmax* that were not unconscionable.

The district court's reasoning is faulty for two reasons. First, the fact that the confidentiality agreements in *Poublon* and *Carmax* contained an express exception to confidentiality if the parties agreed

_____

[6] This Court recognized in *Poublon* that *Pokorny* and *Ting* did not rely on any California law, but rather relied on earlier federal cases that in turn relied on non-California cases. *Poublon,* 846 F.3d at 1267.

was not a fact that either court relied on—or even mentioned—in determining that the confidentiality provision passed muster. *See Poublon,* 846 F.3d at 1265-67; *Carmax,* 224 Cal. App. 4th at 408. Second, this is a distinction without a difference. Whether or not the FHP expressly states that confidentiality can be waived by mutual agreement of the parties, it is a fundamental principle of contract law that parties can always mutually agree to something different. It is called a novation. *See* Cal. Civ. Code § 1530. Therefore, the district court's attempt to distinguish *Poublon* and *Carmax* fails. Because these cases govern and hold that confidentiality provisions binding both parties are not substantively unconscionable, the district court erred.

**Pre-Arbitration Settlement Proposal.** The FHP contains a requirement that the party requesting the arbitration make a settlement proposal before engaging in an arbitration.[7] (2-ER-130-31.) The district court appears to have misunderstood this "Settlement Discussion" to be a one-sided requirement where a *Network Doctor* would have to make a settlement proposal to VSP, but not vice versa. (1-ER-20-21 [stating that the FHP "requires *a provider* to submit"

---

[7] The "Settlement Discussion" section in the FHP is similar to the cost-shifting provisions of California Code of Civil Procedure Section 998 and Federal Rule of Civil Procedure 68, the purpose of which "is to encourage the settlement of lawsuits prior to trial." *Markow v. Rosner,* 3 Cal. App. 5th 1027, 1052 (2016).

a settlement proposal before proceeding to arbitration [emphasis added].) But this requirement of making a settlement proposal is *mutual*. The "Claimant" who is to make a "Settlement Proposal" is defined (in the immediately preceding section of the FHP) as "the requesting party"—i.e., the party requesting arbitration (2-ER-130)—and so could be either VSP or the doctor. In other words, whichever party is dissatisfied with the decision of the fair hearing panel, and hence seeks a second level of review, is required to make such a settlement proposal. In practice, both doctors and VSP itself have sought such arbitral review.

The district court concluded that the "Settlement Discussion" provision was likely substantively unconscionable because it *could* require a Network Doctor to bear more costs than if she brought the claim in court, relying on *Pokorny,* 601 F.3d at 1004. (1-ER-20-21.) That analysis is not supported by law.

In *Tompkins v. 23andMe, Inc.,* 840 F.3d 1016 (9th Cir. 2016), this Court determined that a bilateral clause awarding attorneys' fees and costs to the prevailing party was not unconscionable. *Id.* at 1025. This Court expressly rejected the argument that the bilateral prevailing party award was unconscionable because "it would require consumers to shoulder fees that they would not have to bear in litigation." *Id.* at 1026. In rejecting this argument, this Court distinguished *Pokorny* and other earlier cases where it had previously

44

struck down fee-shifting clauses in arbitration agreements as unconscionable. This Court noted that after *Pokorny* and other cases were decided, the California Supreme Court indicated that the rule that an arbitration agreement generally cannot require a litigant to bear any type of expense she would not be required to bear if she were free to bring the action in court "*is limited to the employment context.*" *Ibid.* (citing *Sanchez*, 61 Cal. 4th at 911) (emphasis added). This Court determined that *Sanchez's* "case-by-case determination of affordability" approach "supersedes prior appellate court decisions." *Tompkins,* 840 F.3d at 1026.

Here, as in *Tompkins,* Fox has not demonstrated that she is *unable* to pay for arbitration fees or $15,000 in attorneys' fees, or that paying such fees would "thwart" her ability to arbitrate the dispute. No evidence suggests that this is the case. Rather, the evidence demonstrates that Fox is an experienced doctor who owns her own optometry practice. (2-ER-86, 268-75.) Under this case-specific standard, Fox did not carry her burden of establishing that she is likely to prove that this "Settlement Discussion" provision is substantively unconscionable.

Apart from how the standard articulated in Pokorny has been superseded, the district court's reliance on *Pokorny* is misguided for another reason. In *Pokorny*, the award of fees and costs to the prevailing party was *mandatory. Pokorny,* 601 F.3d at 1004. But in

the FHP, an award of attorneys' fees (capped at $15,000) and costs is *not* mandatory—but can be awarded at the arbitrator's discretion. (2-ER-137.)

The district court accordingly erred as a matter of law in finding that Fox likely could demonstrate that any provision of the FHP is substantively unconscionable.

### c. Any unconscionable provision of the FHP should be severed.

Even if a provision of the FHP is deemed substantively unconscionable, the offending provision should be severed and the remainder of the FHP enforced. Cal. Civ. Code § 1670.5; *Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975, 986 (2010). Yet the district court refused to sever any provisions, saying Fox can likely prove that "unconscionability permeates this agreement, so much so that severing certain clauses would not cure the illegality." (1-ER-22.) For the reasons already outlined above, the district court erred in determining that the provisions of the FHP addressed are substantively unconscionable. As a result, the court similarly erred in determining that Fox can likely show that unconscionability "permeates" the FHP such that a court should refuse to enforce any part of the FHP.

**B.  Fox Would Not Suffer Irreparable Harm Without An Injunction.**

The district court wrongly concluded that Fox would suffer irreparable harm without injunctive relief. Specifically, that Fox "established that she will suffer irreparable harm if she must participate in a dispute resolution process which the Court may later find illegal." (1-ER-22-24.) This conclusion rests on inapposite and nonbinding district court cases, rather than governing precedent from this Court.

The district court ignored VSP's citation to *Camping Construction*, 915 F.2d at 1349, where this Court held it was "simply not the case" that "unnecessarily undergoing arbitration proceedings constitutes irreparable injury." *See also Renegotiation Bd. v. Bannercroft Clothing Co.,* 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (same).

This Court in *Camping* gave several reasons for its ruling that participating in arbitration proceedings that ultimately may prove unnecessary did not constitute irreparable harm. These reasons included that (1) such harm is speculative; (2) an arbitration award is not self-executing, and so "cannot by itself inflict anything like irreparable injury"; and (3) an adequate remedy at law exists for an

47

allegedly improper award. *Camping Construction*, 915 F.2d at 1349. This Court further noted that "the short time and slight expense involved in the typical arbitration" would "scarcely qualify as irreparable injury. *Id.; see also, Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.,* 736 F.3d 1239, 1242, 1249-50 (9th Cir. 2013) (vacating preliminary injunction because no irreparable harm was shown; holding that irreparable harm requires that remedies available at law, including money damages, are inadequate, and speculative harm is insufficient).

The district court inexplicably ignored this binding precedent, and nevertheless concluded that Fox's participation in a potentially unnecessary arbitration *did* constitute irreparable harm. (2-ER-22-24.) To reach this erroneous conclusion, the court relied on inapposite and non-binding district court cases: *Morgan Stanley & Co., LLC v. Couch,* 134 F. Supp. 3d 1215 (E.D. Cal. 2015) and *World Group Securities v. Tiu,* 2003 WL 26119461 (C.D. Cal. Jul. 22, 2003).

In *Morgan Stanley,* the district court was considering a situation where the parties had *not* agreed to arbitrate their disputes. In this situation, the district court said, "most, if not all courts hold that being required to arbitrate a dispute that the parties did not agree to arbitrate is *per se* irreparable harm." *Morgan Stanley,* 134 F. Supp. 3d at 1235. Whether or not the district court was correct in that statement is irrelevant, however, because the situation in Fox's cases is one where

48

the parties indisputably *did* agree to arbitrate. Fox is simply now claiming that their agreement is not unenforceable. Thus, *Morgan Stanley* is inapposite.

As for the comment in *Morgan Stanley* that "the Ninth Circuit apparently has not addressed the issue explicitly" but "has indicated that irreparable injury presumptively would exist if a party is required to expend resources participating in an arbitration in which it has no duty to participate" (*ibid.*), the court was apparently unaware of *Camping*, and instead relied on dicta from an earlier opinion that only mentioned the issue in passing, in a footnote: *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distrib., Teamsters Local 63*, 849 F.2d 1236, 1241 n. 3 (9th Cir. 1988). But *Camping,* not dicta in *LAWI/CSA*, is the controlling precedent.

*Tiu,* an unpublished district court case, is similarly inapposite. There, as in *Morgan Stanley*, there was no agreement to arbitrate; the plaintiff had never consented to arbitration. *Tiu,* 2003 WL 26119461 at *7. In finding irreparable harm, the *Tiu* court stated "courts have found irreparable injury where a party may be compelled to arbitrate a claim it did not agree to arbitrate," relying on a Ninth Circuit case in which it was expressly stated that the issue of irreparable harm was not appealed. *Id., citing Textile Unlimited, Inc. v. A..BMH & Co., Inc.,* 240 F.3d 781, 786 (9th Cir. 2001). In *Textile,* this Court stated only, "[t]he district court found that Textile would suffer irreparable harm if

49

the arbitration were not stayed, that the balance of hardships tipped in Textile's favor and that it was in the public interest to stay arbitration. These findings were not clearly erroneous, and A..BMH does not contest them on appeal." *Textile,* 240 F.3d at 786. Thus, the *Tiu* court's reliance on *Textile* is highly dubious on its face. And because the circumstances are materially different—because there *is* an agreement to arbitrate here—*Tiu* lacks any precedential value. In sum, the district court erred in ignoring binding precedent.

### C. The Balance of Hardships Actually Tips in VSP's Favor.

The district court concluded that the balance of hardships tipped in Fox's favor because without an injunction, "Fox will have to expend considerable time and resources to engage in a potentially illegal dispute resolution process," whereas an injunction "only temporarily prevents the dispute resolution process from proceeding while the Court determines the legality of that process." (1-ER-24-25.) The court believed that the injunction "will not harm VSP" because "VSP will still have the opportunity to implement its dispute resolution process if the Court finds that process legal." (1-ER-24.) This analysis is wrong.

As demonstrated above, incurring expenses to participate in an arbitration, even one that might prove unnecessary, does not constitute a harm warranting injunctive relief. *See Camping,* 915 F.2d at 1349;

*see also Graphic Commc'ns Union, Chicago Paper Handlers' & Electrotypers' Local No 2 v. Chicago Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985) ("[T]hat an order to arbitrate imposes a cost, the cost of the arbitration, whether it is an opportunity cost of time or an out-of-pocket expense for lawyers or witness fees or whatever, or both types of costs, does not show irreparable harm. Otherwise every order to arbitrate would be deemed to create irreparable harm ….").

Even if the expenditure of time and resources could be considered a harm, this is a neutral factor at most, because VSP will also have to prepare for a hearing.

Thus, the balance of equities tips strongly against an injunction. As demonstrated by Fox's reference to other cases filed by her attorney for other doctors challenging the FHP, litigants will use an injunction issued in this case to bolster their own efforts to enjoin the FHP. (2-ER-140.) The injunction issued here inhibits VSP's ability to engage in the mandatory dispute resolution process with other doctors. Further, the delay imposed by the injunction may well provide time and opportunity for Fox to dissipate the monies sought to be recovered due to her false claims. Therefore, the district court erred in finding that Fox had demonstrated that the balance of hardships tip in favor of issuing an injunction.

### D. Public Interest Is Not A Neutral Factor, And Weighs Against Injunctive Relief.

The district court erroneously found that the public interest factor in the preliminary injunction analysis was "neutral." (1-ER-25.) As this Court has noted, if "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction," rather than a *neutral* factor when the reach of an injunction "has no impact on non-parties." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138-39 (9th Cir. 2009).

As explained above, if a preliminary injunction issues, doctors on whom VSP has imposed discipline—seeking to avoid having to pay restitution or the imposition of other discipline—are likely to challenge the validity of the FHP and use the injunction to support halting the FHP mechanism in other cases. This would result in increased litigation costs to VSP, a not-for-profit entity, which would ultimately impact the VSP policyholders—members of the public. This is because VSP would have to pass its increased costs on to its policyholders. (2-ER-231.) Although the district court said the issuance of an injunction "will not likely have" these effects, one need only look to the evidence Fox presented to support her motion for preliminary injunction to see that this *is* a likely outcome: Fox's "evidence" included her attorney's detailed description of other,

allegedly similar, pending cases he has brought on behalf of other doctors under similar theories. (2-ER-140.) Increased costs to the public are a very real and likely effect of an injunction. Thus, the injunction *is* likely to reach non-parties, making the "public interest" factor relevant, weighing *against* the issuance of an injunction.

## VI.    CONCLUSION

The district court erred as a matter of law in finding that Fox established all the elements necessary for a preliminary injunction. In fact, Fox has no likelihood of success on the merits, would not suffer irreparable harm, and the balance of hardships tip in VSP's favor. The preliminary injunction should be reversed.

Dated: April 21, 2017          Respectfully submitted,

                               By: *s/Andrew H. Struve*
                                   *Attorneys for Appellant*
                                   Vision Service Plan

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7)(B) and contains **11,487** words, exclusive of the corporate disclosure statement, the table of contents, the table of authorities, as counted by the 2003 Microsoft Word word-processing program used to generate this brief.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 2003 Microsoft Word word-processing program with a 14-point Times New Roman font.

Dated: April 21, 2017          Respectfully submitted,

By: *s/Andrew H. Struve*
*Attorneys for Appellant*
Vision Service Plan

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.

Dated: April 21, 2017          Respectfully submitted,

By: *s/Andrew H. Struve*
*Attorneys for Appellant*
Vision Service Plan

54

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/ECF system on April 21, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: *s/Bess Hubbard*

318538337.1